FILED

2007 FEB 13   AM 11: 08

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

June 2005 Grand Jury   '07 CR 0329 LAB

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KYLE DUSTIN FOGGO (1),<br>aka "Dusty" Foggo,<br>BRENT ROGER WILKES (2),<br><br>Defendants. | Criminal Case No. _____<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 371 –<br>Conspiracy; Title 18, U.S.C.,<br>Secs. 1343 and 1346 – Honest<br>Services Wire Fraud; Title 18,<br>U.S.C., Sec. 1957 – Money<br>Laundering; Title 18, U.S.C.,<br>Sec. 2 – Aiding and Abetting |

The Grand Jury charges:

**INTRODUCTORY ALLEGATIONS COMMON TO ALL COUNTS**

1.   From on or about July 6, 2001 to about November 3, 2004, defendant KYLE DUSTIN FOGGO, aka "Dusty" Foggo, was the senior officer in charge of support operations at an "Overseas Location" of the Central Intelligence Agency ("CIA"), and as such directed the Overseas Location's daily operations supplying equipment to personnel overseas.

2.   From on or about November 4, 2004 to about May 12, 2006, defendant FOGGO was the Executive Director of the CIA (then the third-highest position in the CIA), and as such directed the CIA's daily operations.

SB:JAF:PLBH:nlv:San Diego
2/13/07

3.    As a CIA employee, defendant FOGGO owed the United States and its citizens his honest services, including his loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, fraud, and corruption.

4.    As a public official, FOGGO had a responsibility to place loyalty to the United States, and its Constitution, laws, and ethical principles, above private gain.   Among other things, FOGGO was prohibited from using or permitting the use of his office in a manner intended to coerce or induce another, including a subordinate, to provide any benefit to himself or his friends.

5.    From in or about 1993 through in or about 2005, defendant FOGGO completed ethics training approximately eight times, and served approximately two years as a Deputy Ethics Official.

6.    At all times material to this indictment, defendant BRENT ROGER WILKES owned and controlled ADCS, Inc. and numerous related entities, including Archer Defense Technologies, Inc., Group W Advisors Inc., Group W Transportation Inc., and Wilkes Corporation, which WILKES ran as a consortium of related companies (hereinafter referred to as "WILKES's companies").

7.    From late 2002 on, WILKES's companies' main corporate office was at 13970 Stowe Drive, Poway, California.  WILKES's companies also maintained an office located at 14020 Thunderbolt Place, Chantilly, Virginia.

//
//
//
//

2

1                              **Count 1**

2                              **CONSPIRACY**

3        8.    Paragraphs 1 through 7 of this Indictment are hereby

4   realleged as if fully set forth herein.

5        9.    Beginning on a date unknown to the Grand Jury, and

6   continuing through in or about April 2005, within the Southern

7   District of California and elsewhere, defendants KYLE DUSTIN FOGGO,

8   aka "Dusty" Foggo, and BRENT ROGER WILKES, did knowingly and

9   intentionally conspire with each other, and with others known and

10  unknown to the Grand Jury, to commit the following offenses against

11  the United States:

12           a.    Honest Services Wire Fraud, in violation of Title 18,

13  United States Code, Sections 1343 and 1346, that is, devising a

14  material scheme to defraud the United States and its citizens of

15  defendant FOGGO's honest services, including their right to his loyal,

16  faithful, disinterested, unbiased service, to be performed free of

17  deceit, undue influence, conflict of interest, self-enrichment, self-

18  dealing, concealment, fraud, and corruption, and in furtherance

19  thereof transmitting and causing to be transmitted in interstate

20  commerce by means of wire communications, certain writings, signs,

21  signals and sounds; and

22           b..   Engaging in Monetary Transactions in Property Derived

23  from Specified Unlawful Activity, in violation of Title 18, United

24  States Code, Section 1957, that is, knowingly engaging and attempting

25  to engage in monetary transactions by, through, or to a financial

26  institution, affecting interstate and foreign commerce, in criminally

27  derived property of a value greater than $10,000, such property having

28  been derived from a Specified Unlawful Activity, that is, Honest

Services Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1346.

### METHODS AND MEANS

10. The conspirators used the following methods and means, among others, to carry out the objects of the conspiracy:

a. Defendant WILKES and other conspirators provided things of value to defendant FOGGO, and defendant FOGGO accepted these things of value.

b. Defendant FOGGO agreed to be corruptly influenced in his performance of his official duties.

c. The coconspirators misrepresented and concealed material facts in dealings with the CIA and its employees. Such material facts included defendant WILKES's role and interest in CIA contract matters, defendant FOGGO's receipt and expectation of benefits from WILKES and WILKES' companies, and defendant FOGGO's life-long friendship with defendant WILKES.

d. The coconspirators created and used shell companies and straw men to conceal defendant WILKES's financial interest and role in CIA contracts, and to launder money obtained from CIA contracts.

e. Defendant FOGGO used his seniority and influence within the CIA to influence CIA contractors to provide money to defendant WILKES.

f. Defendant FOGGO provided defendant WILKES and other coconspirators with internal government information, including classified information, about the CIA, CIA contractors, and other matters, to help WILKES obtain money from the CIA and CIA contractors; despite the fact that defendant WILKES never had the requisite

4

1  security clearance to receive classified information from defendant
2  FOGGO.

3  **OVERT ACTS**

4  11.  In furtherance of the conspiracy and to effect the objects
5  thereof, defendants FOGGO and WILKES committed, and caused to be
6  committed, the following overt acts, among others, within the Southern
7  District of California and elsewhere:

8  (1)  By no later than December 2002, WILKES reserved
9  an office for FOGGO near WILKES's own office in the executive suite
10  of WILKES's companies' new Poway headquarters, and offered FOGGO a
11  high-level, high-paying position in WILKES's companies, an offer which
12  remained open and under consideration by FOGGO at all material times.

13  (2)  On or about May 14, 2003, FOGGO sent WILKES an
14  email stating in part as follows with respect to a certain CIA
15  Contractor with whom FOGGO's Overseas Location had negotiated large
16  contracts (hereinafter, "the CIA Contractor"):  "I have been throwing
17  millions at his company for about 18 months – and I'm thinking we
18  should be able to leverage some Wilkes Group contacts."

19  (3)  On or about June 17, 2003, FOGGO introduced WILKES
20  to the CIA Contractor.

21  (4)  On or about July 25, 2003, FOGGO concealed from
22  a subordinate the identity and contact information of an associate
23  (hereinafter, FOGGO's "Water Contact") that FOGGO knew could supply
24  the Overseas Location with bottled water at a much lower price than
25  the Overseas Location had been paying.

26  (5)  On or about August 3, 2003, WILKES paid for FOGGO
27  and his family to join WILKES and his family for a vacation in
28  Scotland.  This vacation included over $12,000 in private jet flights,

5

1 over $4,000 for a helicopter ride to a round of golf at Carnoustie,

2 and over $44,000 for a stay at the Pitcastle Estate, which included

3 trout fishing on hill lochs, salmon fishing on the River Tay, clay

4 pigeon shooting, archery, and a seven-person staff.

5             (6)   On or about September 10, 2003, FOGGO sent WILKES

6 an email titled "Scotland and Cigars," stating in part:   "I'll work

7 the water thing with [FOGGO's Water Contact] - but you sending a

8 follow-up email is a good idea, I want to insure [sic] that B-

9 connection is not forgotten....Group W is in this deal."

10            (7)   On or about September 17, 2003, FOGGO sent an

11 email to WILKES, stating that FOGGO's Water Contact was ready to work

12 with WILKES, and that WILKES should "work the price" with the Water

13 Contact "and then have a US firm (Group W?) fax to me an offer to sell

14 at X price."

15            (8)   On or about October 22, 2003, WILKES caused one

16 of WILKES' assistants to send an email to a close associate and

17 subordinate of WILKES (hereinafter, "Wilkes Subordinate X"), reminding

18 Wilkes Subordinate X of tasks WILKES had assigned him in connection

19 with the project to supply water to FOGGO's Overseas Location.

20            (9)   In or about December 2003, at a party at WILKES's

21 offices in Poway, WILKES introduced FOGGO to a group of employees as

22 a future executive in WILKES's companies.

23            (10)  In or about December 2003, at the same party,

24 FOGGO told an ADCS employee in human resources that he wanted to "get

25 a profile" on some other ADCS employees.

26            (11)  From on or about December 27, 2003 to January 3,

27 2004, FOGGO joined WILKES for a vacation at the "Sullivan Estate" in

28 Haleiwa, Hawaii, for which WILKES paid approximately $32,000.

6

1    (12) On or about January 7, 2004, immediately after his
2  Hawaiian vacation with WILKES, FOGGO sent Wilkes Subordinate X an
3  email with a subject line of "Re: Aloha," stating:  "Had a great time
4  – no diving, but still fun.  I would like the 'President' or 'CEO' of
5  '[entity]' to come visit.  Brent told me that was you (smile), so lets
6  [sic] get to it.  I'll need to brief you a bit on how we need to play
7  this, but that needs to be face to face, before you meet my people."

8    (13) On or about January 27, 2004, FOGGO met with
9  WILKES,  Wilkes Subordinate X,  and  the  CIA  Contractor  at  CIA
10  headquarters.

11    (14) On or about January 27, 2004, at the above
12  meeting, FOGGO told Wilkes Subordinate X that FOGGO would get Wilkes
13  Subordinate X a procurement services contract with the CIA.

14    (15) On or about January 28, 2004, WILKES treated FOGGO
15  to a dinner at the Capital Grille, for which WILKES paid $1,195.96,
16  of which FOGGO's pro rata share was approximately $398.65.

17    (16) On or about January 28, 2004, the CIA Contractor
18  entered into contracts with WILKES, agreeing to pay a WILKES company
19  $375,000 every three months for lobbying services; to form a joint
20  venture with WILKES to explore non-CIA business; and to pay WILKES
21  (through Group W Advisors, Inc.) 30 percent of the joint venture's net
22  income in 2004, and 20 percent in subsequent years.

23    (17) On or about January 29, 2004, defendant WILKES
24  (through Group W Advisors, Inc.) received $375,000 from the CIA
25  Contractor.

26    (18) On or about February 9, 2004, WILKES sent FOGGO
27  an email asking FOGGO to suggest to the CIA Contractor that WILKES was

28

1    playing a role in structuring a prospective CIA contract because doing
2    so, "[d]oesn't cost you anymore but gives me a %."

3    (19) In or about late February 2004, WILKES and Wilkes
4    Subordinate X traveled separately to FOGGO's Overseas Location to
5    discuss the procurement services contract.

6    (20) On or about February 26, 2004, FOGGO instructed
7    Wilkes Subordinate X not to tell other CIA employees about the long-
8    standing personal relationship they had through WILKES, and instead
9    to tell CIA employees that Wilkes Subordinate X and FOGGO met in a
10    cigar bar in Washington, D.C.

11    (21) On or about February 26, 2004, FOGGO introduced
12    Wilkes Subordinate X to lower-level CIA employees as someone who could
13    assist them in procurement activities, and both FOGGO and Wilkes
14    Subordinate X acted as if they were merely arms-length business
15    associates.

16    (22) On or about February 28, 2004, in a meeting at
17    FOGGO's home, FOGGO, WILKES, and Wilkes Subordinate X agreed that they
18    needed to ensure that any procurement services business obtained from
19    the Overseas Location could not be directly traced back to FOGGO and
20    WILKES's relationship, and that WILKES would therefore take his share
21    of the proceeds through subcontracts.

22    (23) On or about March 14, 2004, FOGGO sent an email
23    to the CIA Contractor stating that he had discussed the CIA
24    Contractor's recent classified contract proposal with WILKES, and
25    stating further: "I must tell you - I am very pleased that you and
26    Brent are working together."

27    (24) In or about March 2004, under the company name
28    Archer Defense, which was then a part of ADCS, Wilkes Subordinate X

8

1  caused to be delivered to the Overseas Location a shipment of bottled
2  water, for a price that was marked-up over 60% from the price FOGGO's
3  Water Contact charged.

4          (25) On or about April 5, 2004, FOGGO filed and
5  certified the truthfulness, completeness, and accuracy of a "Public
6  Financial Disclosure Report" (Form SF-278) for calendar year 2003,
7  which Report called for disclosure of (among other things) all gifts
8  "received from one source totaling more than $285" and agreements or
9  arrangements for future employment, and from which Report FOGGO
10  omitted any mention of (a) the thousands of dollars in benefits he
11  received from WILKES in 2003, or (b) his job offer from WILKES.

12          (26) On or about April 5, 2004, in an email to a CIA
13  ethics officer, to which email FOGGO attached his 2003 Form SF-278,
14  FOGGO stated in part:  "Greetings from [Overseas Location].  Having
15  been the 'Ethic's [sic] Guy' in both the DS&T and the DA, I wish you
16  the best with this annual exercise."

17          (27) On or about June 11, 2004, while visiting the
18  Overseas Location to negotiate the procurement services contract,
19  Wilkes Subordinate X treated FOGGO to a meal at a restaurant near the
20  Overseas Location, for which Wilkes Subordinate X paid $235.82, of
21  which FOGGO's pro rata share was approximately $117.91.

22          (28) On or about July 29, 2004, at WILKES's direction,
23  Wilkes Subordinate X formed a new corporation of which he was
24  nominally the only director, officer, or employee, hereinafter "Shell
25  Company No. 1", to receive the procurement services contract from the
26  CIA.

27          (29) On or about August 19, 2004, FOGGO sent emails to
28  Wilkes Subordinate X, informing him that FOGGO had instructed his

1   deputy to "check and push [the procurement contract] along to insure

2   completion" and also stating with regard to Wilkes Subordinate X's

3   request for an advance payment of one-half the total amount of service

4   fees for the procurement contract: "I can help with that.  I'll work

5   it."

6        (30) On or about September 16, 2004, FOGGO sent an

7   email to WILKES regarding concerns that the CIA Contractor had raised

8   about WILKES, stating: "As you know I do have influence with him [the

9   CIA Contractor] and know I could get him to listen . . . that said if

10   this issue is beyond repair in your mind - I am now, have been in the

11   past, and will continue to as long as I breath [sic] - be your partner

12   . . . so what do you want me to do?"

13        (31) On  or  about  September  20,  2004,  effective

14   September 1, 2004, FOGGO caused the Overseas Location to enter into

15   a one-year procurement services contract with Shell Company No. 1,

16   with a firm fixed-price fee of $1,699,904 for services to be provided.

17        (32) On or about September 23, 2004, FOGGO caused the

18   CIA to wire-transfer to Shell Company No. 1 an $850,000 advance

19   payment on the procurement services contract.

20        (33) On or about September 24, 2004, Wilkes Subordinate

21   X caused $555,000 to be wire-transferred from Shell Company No. 1 to

22   WILKES's companies.

23        (34) On or about October 28, 2004, without having

24   received any additional service funds from the CIA, Wilkes Subordinate

25   X caused $150,000 more to be wire-transferred from Shell Company No.

26   1 to WILKES's companies, bringing WILKES's direct share of the initial

27   $850,000 to $705,000.

28

1        (35) On or about November 20, 2004, WILKES treated
2   FOGGO to a meal at the Serbian Crowne restaurant, for which WILKES
3   paid $773.65, of which FOGGO's pro rata share was approximately
4   $257.88.

5        (36) On or about November 20, 2004, WILKES gave FOGGO
6   an Ellie Bleu cigar humidor, which Wilkes Subordinate X had purchased
7   for $2,307.38 at WILKES's direction.

8        (37) On or about November 21, 2004, WILKES treated
9   FOGGO to a meal at the Capital Grille in Tyson's Corner, Virginia, for
10  which WILKES paid $712.15, of which FOGGO's pro rata share was
11  approximately $237.38.

12       (38) On or about November 22, 2004, WILKES treated
13  FOGGO to a meal at Ruth's Chris Steak House in Fairfax, Virginia, for
14  which WILKES paid $902.33, of which FOGGO's pro rata share was
15  approximately $225.58.

16       (39) On or about February 28, 2005, Wilkes Subordinate
17  X caused $110,000 to be wire-transferred from Shell Company No. 1 to
18  WILKES's companies.

19       (40) On or about March 18, 2005, FOGGO sent an email
20  to a bank loan officer stating in part: "I plan to retire in circa 3
21  years - while I have a big offer from a company in California - I may
22  stay in the area due to my worth to local companies...I guess I can't
23  give you a firm answer - I would bet we will be elsewhere - which
24  leads me to consider renting..."

25       (41) On or about March 31, 2005, WILKES sent Wilkes
26  Subordinate X an email stating: "I talked to the big guy last night.
27  He will sprinkle some magic dust today that should solve your problem.
28  BRW"

11

1    (42) On March 31, 2005, FOGGO sent an email to the
2  acting head of the Overseas Location inquiring about delays in
3  payments to Shell Company No. 1; resulting in three service fee
4  payments totaling $231,792 to Shell Company No. 1 in less than thirty
5  days.

6    (43) On or about March 31, 2005, WILKES sent FOGGO an
7  email thanking him for inquiring with the Overseas Location.

8    (44) On or about April 28, 2005, FOGGO filed and
9  certified the truthfulness, completeness, and accuracy of a "Public
10  Financial Disclosure Report" (Form SF-278) for calendar year 2004,
11  which Report called for disclosure of (among other things) all gifts
12  "received from one source totaling more than $285" and agreements or
13  arrangements for future employment, and from which Report FOGGO
14  omitted any mention of (a) the thousands of dollars in benefits he
15  received from WILKES in 2004, or (b) his job offer from WILKES.
16  All in violation of Title 18, United States Code, Section 371.

17                      **Counts 2 through 8**

18                  **HONEST SERVICES WIRE FRAUD**

19    12.  Paragraphs 1 through 7 and 10 through 11 of this indictment
20  are hereby realleged as if fully set forth herein.

21    13.  Beginning on a date unknown to the Grand Jury, and
22  continuing through in or about April 2005, within the Southern
23  District of California and elsewhere, defendants KYLE DUSTIN FOGGO,
24  aka "Dusty" Foggo, and BRENT ROGER WILKES, devised and intended to
25  devise a material scheme to defraud the United States and its citizens
26  of defendant FOGGO's honest services, including their right to his
27  loyal, faithful, disinterested, unbiased service, to be performed free
28  of deceit, undue influence, conflict of interest, self-enrichment,

                              12

1  self-dealing, concealment, fraud, and corruption; said scheme more

2  fully described elsewhere in this indictment.

3  **WIRE TRANSMISSIONS IN EXECUTION OF THE SCHEME**

4  14.   On or about the dates set forth below (Column "A"), within

5  the Southern District of California and elsewhere, defendants KYLE

6  DUSTIN FOGGO, aka "Dusty" Foggo, and BRENT ROGER WILKES, for the

7  purpose of executing the above-described scheme to defraud,

8  transmitted and caused to be transmitted in interstate commerce by

9  means of wire communications, certain writings, signs, signals and

10  sounds as alleged below (Column "B"):

| COUNT | DATE | TRANSMISSION |
|---|---|---|
| | (A) | (B) |
| 2 | 5/14/03 | Email (regarding leveraging CIA Contractor to give WILKES business) from defendant FOGGO, outside of California, to defendant WILKES, through San Diego County, California. |
| 3 | 9/10/03 | Email (regarding a potential contract to supply bottled water to the Overseas Location) from defendant FOGGO, outside of California, to defendant WILKES, through San Diego County, California. |
| 4 | 10/22/03 | Email (regarding water supply tasks WILKES assigned to Wilkes Subordinate X), from an assistant to defendant WILKES, through San Diego County, California, to Wilkes Subordinate X, outside of California. |
| 5 | 1/7/04 | Email (regarding how to "play" Wilkes Subordinate X's role in procurement contract with FOGGO's Overseas Location, "before you [Wilkes Subordinate X] meet my people") from defendant FOGGO, outside of California, to Wilkes Subordinate X, through San Diego County, California. |
| 6 | 2/9/04 | Email (regarding FOGGO helping WILKES to obtain money from CIA Contractor) from defendant WILKES, through San Diego County, California to defendant FOGGO, outside of California. |

13

|  | (A) | (B) |
|---|---|---|
| COUNT | DATE | TRANSMISSION |
| 7 | 9/16/04 | Email (stating that FOGGO would be WILKES's "partner" for as long as FOGGO breathed) from defendant FOGGO outside of California to defendant WILKES, through San Diego County, California. |
| 8 | 3/31/05 | Email (thanking FOGGO for expediting payments to Shell Company No. 1) from defendant WILKES, through San Diego County, California, to defendant FOGGO, outside of California. |

All in violation of Title 18, United States Code, Sections 1343 and 1346, and 2.

## Counts 9 through 11

## MONEY LAUNDERING – UNLAWFUL MONETARY TRANSACTIONS

15.   Paragraphs 1 through 7 and 10 through 11 of this indictment are hereby realleged as if fully set forth herein.

16.   On or about the dates set forth below (Column "A"), within the Southern District of California and elsewhere, defendants KYLE DUSTIN FOGGO, aka "Dusty" Foggo, and BRENT ROGER WILKES, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 as set forth below (Column "B"), such property having been derived from a Specified Unlawful Activity, that is, Honest Services Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1346:

//

//

//

14

|  | (A) | (B) |
|---|---|---|
| Count | Date | Transaction |
| 9 | 9/24/04 | Wire transfer of $555,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |
| 10 | 10/28/04 | Wire transfer of $150,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |
| 11 | 2/28/05 | Wire transfer of $110,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

DATED: February 13, 2007.

A TRUE BILL:

Foreperson

CAROL C. LAM
United States Attorney

By: SANJAY BHANDARI
Assistant U.S. Attorney

By: JASON A. FORGE
Assistant U.S. Attorney

By: PHILLIP L.B. HALPERN
Assistant U.S. Attorney

15